Robert SNOWDER, et al., Appellants,

v.

**DISTRICT OF COLUMBIA,
et al., Appellees.**

No. 06–CV–959.

District of Columbia Court of Appeals.

Argued Dec. 13, 2007.

Decided June 5, 2008.

Philip Friedman, Washington, for appellants.

William J. Earl, Assistant Attorney General, with whom Linda Singer, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General at the time the brief was filed, were on the brief, for appellee District of Columbia.

Veronica Byam Nannis, with whom Timothy F. Maloney and Steven B. Vinick were on the brief, Greenbelt, MD, for appellees R & R Towing, Farco Towing, and Towing by TRP.

Stephen B. Stern, Washington, with whom Melissa M. McGuane was on the brief, for appellee Perry's Towing and Storage, Inc.

Before WASHINGTON, Chief Judge, and FISHER and THOMPSON, Associate Judges.

WASHINGTON, Chief Judge:

Appellants Robert Snowder, Nadine Garrick, Lawanda Harris, Ronald Kennedy, Verna Montague, and Felicia Moore appeal from a judgment in favor of appellees the District of Columbia and towing companies Perry's Towing and Storage, Inc., R & R Towing, Farco Towing, and Towing by TRP (collectively, "towing companies"). Appellants attempted to bring a

class action lawsuit against the District and the towing companies under numerous theories—breach of bailment, conversion, civil conspiracy, unjust enrichment, and violations of the District of Columbia Consumer Protection Procedures Act ("CPPA")—seeking to recover damages on behalf of people who were charged substantial fees for towing and storage services that were imposed without adequate notice or consent. The trial court denied class certification and ultimately entered summary judgment on all claims. We affirm the trial court's denial of class certification as well as the dismissal of all claims against the District of Columbia. Regarding the towing companies, we affirm the court's dismissal of appellants' breach of bailment claim; however, because the trial court did not discuss or decide appellants' other common law claims, we must remand the case to the trial court for consideration of those claims.

## I. Facts[1]

### A. Appellant Nadine Garrick & Appellee Perry's Towing.

On April 11, 2001, Nadine Garrick reported the theft of her vehicle (which was titled in her father's name) to the Metropolitan Police Department ("MPD"). Though she periodically checked with MPD, she did not receive any information about her vehicle. On May 16, 2001, she filed an insurance claim for the theft with State Farm. On May 31, 2001, State Farm paid her $5,248.38. On June 5, 2001, State Farm wrote to the Georgia Department of Motor Vehicles, seeking to change the title of the stolen vehicle to reflect its ownership of the car.

On August 22, 2001, MPD recovered Garrick's/State Farm's vehicle and requested that appellee Perry's Towing ("Perry's") impound the vehicle. The car remained at Perry's until Perry's sent a certified letter to Ms. Garrick's father, informing him of the vehicle's location. Ms. Garrick informed State Farm, and State Farm paid Perry's for the towing and storage fees. Ms. Garrick then re-purchased her vehicle from State Farm at a public auction on February 22, 2002, for $3,933.00.

### B. Appellant Robert Snowder and Appellee R & R Towing.

Robert Snowder filed a stolen vehicle report on September 6, 2000. Four days later, appellee R & R Towing towed the car from MPD's 6D station. Nine weeks later, R & R Towing notified Mr. Snowder about possession of the vehicle and quoted him a $1,800 towing and storage fee.[2] "Under protest" Mr. Snowder paid $900 to recover his car.

### C. Appellants Lawanda Harris and Ronald Kennedy and Appellee Farco Towing.

On October 15, 2000, Lawanda Harris reported her vehicle stolen. MPD recovered her vehicle three days later and had appellee Farco tow and impound it. Ms. Harris discovered the location after a friend called MPD on October 24, 2000.

1. Because the trial court granted summary judgment to the District and the towing companies, we view the record in the light most favorable to appellants, the nonmoving party. See Childs v. Purll, 882 A.2d 227, 233 (D.C. 2005).

2. Terrance Ross of R & R Towing testified in deposition that in other jurisdictions, such as Maryland, R & R would become suspicious that the owner had not been notified if the vehicle had not been reclaimed within two weeks. He stated that after two weeks (even in D.C.), he would begin to see if he could notify the owner or contact someone who could (i.e., teletype, police officers).

Farco quoted a fee of $395. Harris attempted to view her car at Farco's lot, but they refused to allow her to do so. She did not recover her car; Farco disposed of it.

On October 18, 1999, Ronald Kennedy reported his vehicle stolen to the Prince George's County Police Department. On October 27, 1999, MPD recovered the car and had Farco tow it. Mr. Kennedy's insurance agent informed him of the vehicle's recovery on November 26, 1999, but MPD did not confirm the recovery and location until December 3, 1999. Farco attempted to charge Kennedy $1,353.00. Mr. Kennedy did not recover his car. Although Farco's representative testified that the car could not have been driven off the lot and that he disposed of it, Mr. Kennedy's car continued to receive parking tickets as late as 2002.

## D. Appellants Verna Montague and Felicia Moore and Appellee Towing by TRP.

On November 27, 2001, Verna Montague called MPD, believing her car had been stolen, only to learn that it had been towed for expired tags and impounded by TRP. Ms. Montague could not recover her car, however, as MPD was then holding her keys as evidence in connection with an investigation unrelated to this matter. Although TRP refused to release the car, it promised not to dispose of the car while she got her keys back. Ms. Montague enlisted MPD's help, and MPD helped bargain the charge of $895 down to $350. Ms. Montague then sought to have the car towed elsewhere, but TRP informed her

that it disposed of the car. She thinks she may have seen her car on the streets following the alleged disposal.

On November 6, 2001, Towing by TRP towed Felicia Moore's car, as it was allegedly illegally parked. Upon learning of the location from MPD, Ms. Moore went to recover her car. She arrived between 10:30 and 10:45 P.M., but had to wait for someone to show up, which occurred around 12:45 A.M. (November 7, 2001). TRP charged her $270, which consisted of a $150 towing charge, $50 for special equipment, and $70 for two days of storage ($35 per day), even though the car had been on the lot for three hours. Ms. Moore paid the charges. She later had her parking notice of infraction dismissed, but she did not recover the towing or storage fees.

## E. Towing Regulations in the District of Columbia for the Relevant Time Period.

At the time the appellants' cars were stolen, recovered, or impounded, the District Municipal Regulations provided that MPD officers could direct the towing and impoundment of "unattended and illegally parked vehicles." 18 DCMR § 2421.1 (1987). Further, the regulations required the police department (or an employee of the Department of Public Works) to inform the vehicle owner immediately if possible, but if not, to provide written notice of impoundment to the last known address of the registered owner within five business days. 18 DCMR §§ 2421.2, 2421.4, and 2421.5 (1987).[3] Moreover, internal police orders required the MPD officer who

---

3. District of Columbia Municipal Regulations *now* provide:

> When an authorized government official directs the towing of a vehicle to a towing service storage lot, the government official shall notify the vehicle owner of record in

accordance with DPW procedures, of the tow and storage, the storage location of the vehicle, and all other information required to be given under applicable District law. 16 DCMR § 406.9 (2005); *see* 51 D.C.Reg. 3428, 3432 (Apr. 2, 2004).

recovered a stolen vehicle to take control of the vehicle and notify the owner where it could be reclaimed. *See* MPD Special Order 01–05 (Mar. 1, 2001). The Special Order specifically noted that when the officer arranges for towing, the officer must ensure prompt and accurate notification "so that towing and storage charges can be held to a minimum." *Id.*[4]

## II. Procedural History

Plaintiffs Robert Snowder and Jeffrey Schroeder (who sold the car to Snowder) initially filed a complaint against the District of Columbia and several towing companies on January 8, 2002. Plaintiffs (now expanded) filed an amended complaint on March 22, 2002, as a purported class action. On December 19, 2002, plaintiffs moved for class certification. The trial court (Hon. Natalia Combs Greene) denied class certification.

Perry's Towing moved for summary judgment, alleging that plaintiff Nadine Garrick (the only plaintiff involved with Perry's) lacked standing. The court granted that motion on all of Ms. Garrick's common-law claims, but preserved her claim under the CPPA. Following another motion for summary judgment by Perry's, a motion for summary judgment from the other defendant towing companies, and a motion for partial summary judgment from plaintiffs, the court granted summary judgment to the defendants, thus dismissing plaintiffs' claims except those against D.C. The trial court later granted D.C.'s motion for summary judgment on all claims (though it had previously dismissed the CPPA claim), thus dismissing plaintiffs' remaining claims, noting in a one-

page order that the court agreed with the District's arguments.

## III. Class Certification

■ D.C. Superior Court Rule of Civil Procedure 23 governs class actions. It provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

D.C.Super. Ct. R. Civ. P. 23(a). Further, the purported class can only be certified under D.C.Super. Ct. R. Civ. P. 23(b) if:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or

---

4. The Special Order further details procedures for notifying the owner if the recovering officer cannot immediately do so. For example, if no notification is made within forty-

eight hours, MPD was to send a notification letter by certified mail. MPD Special Order 01–05, at Part IV, A.3 (d).

corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

D.C.Super. Ct. R. Civ. P. 23(b). The plaintiff class "has the burden of showing that [its] cause of action meets the above prerequisites." *Yarmolinsky v. Perpetual Am. Fed. Sav. & Loan Ass'n,* 451 A.2d 92, 94 (D.C.1982). Further, as a preliminary matter, the moving party must demonstrate that the class is " 'neither amorphous, nor imprecise.' " *Lewis v. Nat'l Football League,* 146 F.R.D. 5, 8 (D.D.C. 1992) (quoting *Robertson v. Nat'l Basketball Ass'n,* 389 F.Supp. 867, 897 (S.D.N.Y. 1975)). This court reviews a trial court's denial of class certification for abuse of discretion. *See Ford v. ChartOne, Inc.,* 908 A.2d 72, 84 (D.C.2006).

■ In this case, the plaintiffs identified their class as follows:

> All persons and entities, excluding any member of the judiciary, whose vehicles were towed and/or authorized to be towed in the District of Columbia without their consent by one of the Defendants and who incurred towing and storage charges after the Defendants failed to timely notify such persons their vehicles had been towed and impounded.

The trial court rejected this class. First, the court found the class was "flawed due to its vagueness and speculative nature," and thus, it was too amorphous and imprecise. In this regard, the court noted the lack of a time limitation in the class definition. In addition, the court questioned whether D.C. and the towing companies would have the same duty to notify the owners. The court did not further analyze this question, but noted that if the towing companies did have the same duty as D.C., the class could be "gargantuan," while if it did not, it could be much smaller. This led the court to find that the plaintiffs did not meet the numerosity requirement. Finally, the court noted its "concerns" that the issues of law and fact regarding D.C. would not be the same as those regarding the towing companies. For instance, the court was concerned that *if* the towing companies had any duty to notify, that might require a factual, case-by-case determination. Therefore, the court found no commonality.

Appellants argue that the court abused its discretion by making erroneous conclusions of law. Specifically, appellants argue that the court erred as a matter of law by "preliminarily and ultimately concluding that neither the District nor the Towing Operators have any enforceable duty to notify vehicle owners that their cars have been towed." Relying on *ChartOne, supra,* 908 A.2d at 89, appellants assert that the court here (as the court did in *ChartOne*) erred in denying class certification for the same reason why it would later grant summary judgment. However, contrary to appellants' view, the trial court did not find that neither D.C. nor the towing companies had a duty to notify appellants

at the time it denied class certification; rather, it was concerned that the possibility of different duties could require the court to consider claims against D.C. as distinct from those against the towing companies—thus defeating commonality.

We agree with the trial court that the appellants' purported class failed to meet the commonality requirements for certification. Further, the plaintiffs' class definition is facially imprecise. It purports to include all persons who were not "timely notified," without providing any scope of what that term might mean. Moreover and more problematic, "the class representatives must be members of that class." *Lewis, supra,* 146 F.R.D. at 8; *see* D.C.Super. Ct. R. Civ. P. 23(a) (requiring that "the claims ... of the representative parties are typical of the claims ... of the class."). Here, appellants Ms. Moore and Ms. Montague received tickets and near-immediate notification about the towing of their cars, as their cars were illegally parked. Their claims are distinct from those of other members of the putative class whose cars were stolen and who did not receive notice for extended periods of time. At the very least, the case would require in-depth factual determinations about different individuals to determine whether any duty was breached in a given case. This makes the purported class potentially unmanageable. *See Yarmolinsky, supra,* 451 A.2d at 96 ("Where no one adjudication can settle the question of a defendant's liability to the class members, the case is inappropriate for class action because of the predominance of individual questions over common issues."). Accordingly, the trial court did not abuse its discretion in denying class certification. We must therefore consider whether the named members (appellants) have valid claims in their individual capacities against either the District of Columbia or any of the towing companies.

## IV. The District of Columbia

### A. The Consumer Protection Procedures Act.

■ Appellants assert that the District of Columbia and the towing companies violated D.C. regulations and procedures regarding towing and by failing to notify them about the impoundment of their cars, and that in so doing, the District and the towing companies committed trade practices in violation of the CPPA. "The Consumer Protection Procedures Act is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Atwater v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 566 A.2d 462, 465 (D.C.1989). A main purpose of the CPPA is to "assure that a just mechanism exists to remedy all improper trade practices." D.C.Code § 28–3901(b)(1) (2001).

The CPPA creates a cause of action for consumers to seek redress of unlawful trade practices. Under D.C.Code § 28–3905(k)(1) (2001), "a person, whether acting for the interests of itself, its members or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia" to recover treble damages or $1,500 per violation (whichever is greater), punitive damages, injunctive relief, and reasonable attorney's fees.[5] D.C.Code § 28–3904 (2001) sets forth the types of

---

**5.** This section contains additional remedies for representative actions. *See* D.C.Code § 28–3905(k)(1)(E).

acts that constitute "unlawful trade practices," stating, "[i]t shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to ... (dd) violate any provision of title 16 [regarding towing services] of the District of Columbia Municipal Regulations." Because the D.C. regulations contain certain procedural requirements for MPD officers, appellants believe that a violation of those regulations also exposes the District to liability under the CPPA.

■ This court has previously held that the CPPA "was designed to police trade practices arising only out of consumer-merchant relationships." *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C.1981); *see Carleton v. Winter*, 901 A.2d 174, 179 (D.C.2006) (stating that the CPPA regulates conduct of merchants or goods suppliers); *DeBerry v. First Gov't Mortgage & Investors Corp.*, 743 A.2d 699, 701 (D.C. 1999) (confirming that an unlawful trade practice can only be committed by a "merchant"). The CPPA defines "merchant" as a "person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C.Code § 28–3901(3) (2001). In this case, the District urges that the CPPA does not apply to it, arguing that it is not a "merchant." Relying on the plain language of the statute, it argues that it cannot be considered a merchant because it did not sell or provide the towing services in this case. Appellants, however, believe that the District *indirectly* sold or supplied towing services in this case because the towing companies

acted pursuant to MPD authority; thus, because the towing companies could not act without the city's involvement, the city participated in the trade practice.[6]

While appellants' argument is not without some force given the relationship between MPD and the private towing companies it utilizes in the District of Columbia, we agree with the District and hold that it is not a merchant for purposes of the CPPA. *See Howard, supra*, 432 A.2d at 709 ("While a 'merchant' is not limited to the actual seller of the goods or services complained of, he must be a 'person' connected with the 'supply' side of a consumer transaction."). We have previously held that a nonprofit educational institution was not a merchant under the CPPA. *See Save Immaculata/Dunblane, Inc. v. Immaculata Prep. School, Inc.*, 514 A.2d 1152, 1159 (D.C.1986). In *Save Immaculata*, this court approvingly cited a Wisconsin case, wherein the Wisconsin Supreme Court concluded that its Consumer Act did not regulate a loan from the University of Wisconsin, Madison, explaining that the University—"an arm of the state"—was not a private, commercial business and its purpose was not to earn a profit, "but rather it is motivated by a public, nonprofit purpose." *See Board of Regents of the Univ. of Wisconsin Sys. v. Mussallem*, 94 Wis.2d 657, 669, 289 N.W.2d 801, 807 (1980). Thus, even though the University extended credit, its purpose was not to profit. This court has since confirmed that nonprofit organizations generally, not just nonprofit educational institutions, are not merchants under the CPPA. *See Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1197 (D.C.1997) (concluding

---

**6.** As support, appellants cite *State v. Cottman Transmissions Sys., Inc.*, 86 Md.App. 714, 729, 587 A.2d 1190, 1197 (1991), where the Maryland Court of Special Appeals examined a less expansive consumer protection statute and noted, in light of the word "indirectly" in the statute, that it covered those "who substantially participate[d] in the process." Notably, however, *Cottman* did not involve a consumer claim against a municipality.

that the AARP was not covered by the CPPA even though it accepted fees for arranging the sale of insurance to its members); *see also Kozup v. Georgetown Univ.,* 663 F.Supp. 1048 (D.D.C.1987), *vacated on other grounds,* 271 U.S.App. D.C. 182, 851 F.2d 437 (1988) (declining to find either Georgetown University Hospital or the American Red Cross to be merchants even though the Red Cross received fees for providing blood to the Hospital and the Hospital passed those costs on to its patients). Similarly, the District is not a commercial enterprise. Although MPD is involved in the towing of automobiles in the District, in that it contacts towing companies to retrieve vehicles on its streets, it did not supply the towing and storage services in this case. Nor did it receive any remuneration from those companies for the towing and storage services provided, or enter into a consumer-merchant relationship with any of the vehicle owners. Accordingly, appellants' CPPA claims against the District of Columbia must fail.

### B. D.C.Code § 12–309 Notice of Intent to Sue.

 Appellants also brought a number of common law claims against the District, including breach of bailment, conversion, and civil conspiracy. The District argues that these claims must fail because appellants did not give the District requisite notice of suit pursuant to D.C.Code § 12–309 (2001). That provision states:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the

Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

D.C.Code § 12–309. "Because it is in derogation of the common law principle of sovereign immunity, section 12–309 is to be construed narrowly against claimants." *Gross v. District of Columbia,* 734 A.2d 1077, 1081 (D.C.1999) (internal quotation omitted). "Unless it demonstrates compliance with the requirements of § 12–309, a plaintiff's suit against the District is properly dismissed." *District of Columbia v. Arnold & Porter,* 756 A.2d 427, 436 (D.C. 2000). We review compliance with § 12–309 *de novo. Id.* In this case, only two of the appellants (Nadine Garrick and Lawanda Harris) gave express notice. Appellants, however, offer a variety of theories for why notice was adequate for all appellants. These arguments are unpersuasive.

 Because § 12–309 applies only to unliquidated damage claims, appellants characterize their claims as liquidated. Tort claims, however, are considered unliquidated. *See District of Columbia v. World Fire & Marine Ins. Co.,* 68 A.2d 222, 224–25 (D.C.1949) (finding that a tort claim, even for a fixed amount, was unliquidated). Indeed, in *District of Columbia v. Campbell,* 580 A.2d 1295, 1301–02 (D.C. 1990), this court held that a plaintiff's negligence claim failed for lack of notice, even where he asserted a *quantum meruit* claim. The court distinguished tort and *quantum meruit* claims from true contract claims, noting that the former are unliquidated, while the latter are liquidated. *Id.; see id.* at 1301 (quoting *Giant Food, Inc. v. Jack I. Bender & Sons,* 399 A.2d 1293 (D.C.1979)) (discussing *quantum meruit* damages as " 'by their very nature unliquidated and [that they] must be the subject of controversy and proof at trial' "). Despite appellants' attempts to re-cast their

claims as liquidated, most of the claims sound in tort. Claim I (breach of bailment) is at most a *quasi*-contract theory. *See First American Bank, N.A. v. District of Columbia,* 583 A.2d 993, 996 (D.C.1990). Claim II (conversion) is a tort theory. While some appellants paid certain amounts (which might not be the full extent of their damages, as they sought compensatory damages), others lost their cars entirely, and the value of the cars is uncertain.[7]

 Next, pursuant to the final sentence of D.C.Code § 12–309, appellants assert that their filing of stolen vehicle police reports put the District on notice of a potential future lawsuit. Police reports may indeed suffice as notice, but the report must state both the cause and the circumstances of the injury with enough particularity to inform the District of a reasonable basis for anticipating legal action. *See Pitts v. District of Columbia,* 391 A.2d 803, 809–10 (D.C.1978); *Washington v. District of Columbia,* 429 A.2d 1362, 1366 (D.C.1981) (en banc). Here, appellants' stolen vehicle police reports do not suffice. While the reports detail an injury (stolen vehicle), it is not the injury complained of here (excessive fees/conversion). Moreover, the reports do not establish a reasonable basis for anticipating legal action: informing the District that a car was stolen does not warn the District that the owner might sue the District if it later recovers that vehicle and then impounds it without proper notice.

 Appellants further assert that Ms. Harris and Ms. Garrick provided sufficient notice to suffice for the entire class. Appellants rely on *Dellums v. Powell,* 184 U.S.App. D.C. 324, 338, 566 F.2d 216, 230 (1977), wherein the United States Court of Appeals for the District of Columbia Circuit concluded that an ACLU special counsel's § 12–309 letter sufficed to give notice for an entire class of plaintiffs. The court noted, "[b]ecause the claims asserted by the class representative must be typical of those of the class as a whole, the claims of any class member should in ordinary course be sufficient to indicate what evidence will be relevant to any defense." *Id.* In *Dellums,* a case alleging that a large group of protestors had been unlawfully arrested, the ACLU special counsel representing the class sent a letter that listed eleven plaintiffs by name with the circumstances of their arrests, along with an attached list of sixty-five other named individuals. 184 U.S.App. D.C. at 336, 566 F.2d at 228. Further, the court noted that the police could determine the names of the other 1,200 class members from the police reports written following that protest. 184 U.S.App. D.C. at 338, 566 F.2d at 230.

 This court, however, has viewed *Dellums* narrowly: "[W]e decline to apply *Dellums* . . . a class action case where specific information was provided as to the claimants and types of claims that the District could expect from some 1200 claimants, to this case involving the claims of Arnold & Porter, Lillian Lawrence, Ltd. and their respective insurance agents, about whose claims the District was given absolutely no specific information prior to the filing of the lawsuit." *Arnold & Porter, supra,* 756 A.2d at 437 (rejecting the claims of appellees who filed no notice). Here, Ms. Harris's letter failed to notify D.C. about the claims of others—it discusses only her situation. Neither did Ms. Garrick's letter, written by the class attorney, inform the city of any of the other named parties. Further, as seen in the

---

7. Appellants did not bring claim IV (unjust enrichment) against the District. Further, as noted above, claim V (CPPA claim) fails because the District is not a merchant.

discussion regarding class certification, the purported class could apply to an indeterminate number of people, thus providing the District with little opportunity to investigate and attempt to resolve the anticipated litigation. Ms. Harris's and Ms. Garrick's letters did not sufficiently notify the District of the claims of the other named plaintiffs. As such, the claims of all other appellants against the District were properly dismissed.[8]

## C. Nadine Garrick's Standing to Sue.

■■■ Appellee Perry's Towing argues that appellant Nadine Garrick does not have standing to sue under either her common law theories or the CPPA because State Farm paid her insurance claim following the theft of her vehicle and had assumed ownership of the vehicle prior to the towing by Perry's. See Community Credit Union Servs., Inc. v. Federal Express Servs. Corp., 534 A.2d 331, 333 (D.C. 1987) (noting that plaintiffs must assert their own rights). The trial court agreed, in part, and dismissed Ms. Garrick's common law claims (I–IV); however, it did not dismiss her CPPA claims at that time.

■■■ In response, appellants argue that Ms. Garrick was the owner of the vehicle and that the collateral source rule does not limit an insured from bringing legal claims against tortfeasors even if paid under the insurance claim. Appellants' argument is unavailing: because State Farm owned the vehicle at the time of the towing, the dismissal of claims I–IV as to Ms. Garrick was proper. Here, State Farm paid Ms. Garrick under the policy on June 5, 2001; Perry's did not tow the vehicle until August 22, 2001. Then, upon learning of the recovery, State Farm paid Perry's for the towing and storage charges, made repairs to the car, and then put it up for sale at auction, where Ms. Garrick "re-purchased" the car. Thus, though the title was still in Ms. Garrick's father's name at the time of notification, State Farm clearly exercised control over the vehicle. See Spindle v. Reid, 277 A.2d 117, 118–19 (D.C.1971) (noting that the "rule in this jurisdiction [is] that registration of legal title in one's name is not conclusive as to ownership" within the meaning of the Motor Vehicle Safety Responsibility Act).[9] Accordingly, the trial court's dismissal of Ms. Garrick's common law claims based on her lack of

---

8. Finally, appellants assert (and the District essentially concedes) that if the court views Claim III (civil conspiracy) as a constitutional deprivation claim, D.C.Code § 12–309 notice is not required. See Johnson–El v. District of Columbia, 579 A.2d 163, 170 (D.C.1990) ("As an Eighth Amendment claim brought under 42 U.S.C. § 1983, Johnson–El's complaint is not subject to the notice provisions of D.C.Code § 12–309."). However, in this case, the record is void of any evidence suggesting that the District and the towing companies conspired to deprive the vehicle owners of notice. While appellants may have other meritorious claims, the civil conspiracy claim fails.

9. Appellants argue that the collateral source rule prevents the admission of evidence of the insurance coverage in this case. "The collateral source rule provides, as a general propo-

sition, that an injured party may recover full compensatory damages from a tortfeasor regardless of the payment of any amount of those damages by an independent party (a 'collateral source'), such as an insurance carrier." Bushong v. Park, 837 A.2d 49, 57 (D.C. 2003) (emphasis added). The italicized portions of the collateral source rule, however, demonstrate why it is inapplicable in this case. Here, State Farm (the independent party) compensated Ms. Garrick (the insured) for damages caused by the theft of her vehicle—not for damages caused by Perry's failure to notify (the alleged tort in this case). Thus, while Ms. Garrick could sue the thief of her car despite State Farm's payment, she cannot sue a new tortfeasor because she did not own the vehicle when the second tort occurred.

standing is affirmed.[10]

### D. Lawanda Harris.

Appellant Lawanda Harris timely notified the District of the "approximate time, place, cause, and circumstances of the injury or damage." See D.C.Code § 12–309. Further, the District acknowledged receipt of her letter and informed her that it would process her claim. Ms. Harris's common law claims against the District therefore meet the statutory notice requirements.

The District disputes liability on two grounds. First, the District states that the Municipal Regulations requiring notification applied only to "abandoned or illegally parked vehicles," not recovered stolen vehicles, and that the internal police orders do not establish a standard of care. See Clark v. District of Columbia, 708 A.2d 632, 636 (D.C.1997) ("Because the Suicide Prevention Plan is only an unpublished internal agency procedure and not a statute or regulation, it cannot embody the standard of care under a negligence per se theory."). However, this court has further noted that although internal guidelines cannot themselves embody the standard of care, the "procedures may properly be received in evidence as 'bearing on the stan-

dard of care.'" District of Columbia v. Wilson, 721 A.2d 591, 598 n. 13 (D.C.1998) (quoting Washington Area Metro. Transit Auth. v. Jeanty, 718 A.2d 172, 177 n. 11 (D.C.1998)). Although the court in Clark agreed that the procedures may bear on the standard, it stated that expert testimony would still be required to establish the standard of care. 708 A.2d at 636. Yet in this case, Commander Griffith of the MPD conceded in deposition that MPD has the responsibility of notifying vehicle owners of the towing of their vehicles.[11]

Second, the District argues that because its officers recovered the vehicles in the course of their law enforcement duties, their performance of that public duty is not actionable absent a special relationship, which the District asserts was not involved here. "Under the public duty doctrine, 'a person seeking to hold the District of Columbia liable for negligence must allege and prove that the District owed a special duty to the injured party, greater than or different from any duty which it owed to the general public.'" Powell v. District of Columbia, 602 A.2d 1123, 1129 (D.C.1992) (quoting Klahr v. District of Columbia, 576 A.2d 718, 719 (D.C.1990)). This "special duty" is also referred to as a "special relationship." See

---

10. Ms. Garrick's CPPA claim against the towing companies remains. Though she did not own the vehicle at the time of the alleged injury, she can bring a CPPA claim on behalf of the general public. See D.C.Code § 28–3905(k)(1). Her CPPA claim against the District, however, fails because the District is not a merchant.

11. All told, the regulations, internal operating procedures, and general practice may well confirm a duty on the part of MPD to notify vehicle owners when their cars have been towed or impounded. Further, while not directly argued, intuitively, it is not difficult to see how the regulations regarding the towing of "unattended and illegally parked vehicles," see 18 DCMR § 2421.1, might apply to this

case. The record does not detail the circumstances surrounding the recovery of the stolen vehicles; thus, while it is possible that the officers recovered the vehicles after pulling over the thieves (or others), it is also highly possible that the officers discovered the cars on the streets and found them to be either unattended or illegally parked. If that is the case, then the regulations would directly apply. This, however, is a factual determination that must be made by the trial court in the first instance. Accord, T.R. Ltd. v. Lee, 55 Md.App. 629, 465 A.2d 1186, 1189 (1983) (concluding that a Maryland statute governing unattended motor vehicles applied to a recovered stolen tractor-trailer that had run off the highway).

*Warren v. District of Columbia,* 444 A.2d 1, 3 (D.C.1981) (en banc). This court has recognized at least two ways to demonstrate a special relationship: (1) by showing direct or continuing contact between the victim and the governmental agency, along with justifiable reliance by the victim, *see Platt v. District of Columbia,* 467 A.2d 149, 151 (D.C.1983); or (2) by a statute prescribing mandatory acts for the protection of a particular class of persons rather than the public, *see Turner v. District of Columbia,* 532 A.2d 662, 667 (D.C. 1987).

Ms. Harris has proffered facts which, if proven, demonstrate direct contact with MPD. Following the theft of her car, she repeatedly contacted MPD. She filed a stolen vehicle report on the date of the theft. Then, she asserts that she contacted MPD every two days to ask about her car. During one of these contacts, she alleges that an MPD officer told her that the police would contact her when they recovered her car. On October 18, 2000, MPD recovered the car. Ms. Harris, or a friend, continued to call MPD after this date. But it was not until six days after the recovery that she learned of the impoundment (and this information came from a call by her friend, not one from MPD). These repeated contacts arguably reflect " 'some form of privity between the police department and the victim that sets the victim apart from the general public.' " *Powell, supra,* 602 A.2d at 1130 (quoting *Warren, supra,* 444 A.2d at 10 (Kelly, J., concurring in part and dissenting in part)); *see also id.* at 1131 (finding direct contact where a vehicle owner registered her vehicle and paid a fee, which required the

District to issue a license and registration tags to her).[12]

■ But Ms. Harris cannot prove justifiable reliance. "Justifiable reliance, in this context of proving a special relationship, means particular or special reliance." *See Powell, supra,* 602 A.2d at 1131 n. 11 (quoting *Morgan v. District of Columbia,* 468 A.2d 1306, 1315 (D.C.1983)). "The court has drawn a distinction between cases involving victims who suffer from public officials' fail[ure] to show up at all or do nothing after their arrival, and those who suffer from public officials' affirmative negligence." *Id.* (internal citation and quotation omitted). That is, while the District may be liable for an official's affirmative act that worsens a victim's condition, it will not be liable for that official's inaction or futile action. *See id.* (citing *Johnson v. District of Columbia,* 580 A.2d 140, 143 (D.C.1990)); *see, e.g., Morgan, supra,* 468 A.2d at 1317–18 (no special relationship where the wife of a police officer asked a police captain to keep her abusive husband away from her); *Warren, supra,* 444 A.2d at 3 (no special relationship where citizens informed the police of a rape in progress, even though the police responded to the call and violated internal investigatory procedures). Here, Ms. Harris alleges only a failure to act, not an affirmatively negligent act. Because she cannot establish justifiable reliance, she cannot establish a special relationship with the District. Therefore, her claim against the District must fail.

## V. The Towing Companies

■ Appellants sought recovery from the towing companies based on the theo-

---

**12.** Although this court has indicated that "even a series of contacts over a period of time is not enough 'absent some showing that the agency assumed a greater duty to that person than the duty owed to the public at large,' " *Powell, supra,* 602 A.2d at 1130

(quoting *Wanzer v. District of Columbia,* 580 A.2d 127, 132 (D.C.1990)), we clarified that the *Platt* two-part inquiry (cited here) takes this greater duty factor into account by requiring justifiable reliance. *See id.* at 1130–31.

ries of breach of quasi-bailment, conversion, civil conspiracy, unjust enrichment, and violations of the CPPA. The towing companies principally defended on the ground that they owed no duty to notify appellants about the impoundment, as only MPD had such a duty. Agreeing that appellants failed to establish that the towing companies have a duty to notify vehicle owners that their cars have been towed, the trial court granted summary judgment. In doing so, however, the trial court neither discussed nor decided appellants' conversion, civil conspiracy, unjust enrichment, or CPPA claims.[13] Therefore, although we affirm the court's conclusion that appellants failed to establish the towing companies' duty to notify, we must remand the case for the court to consider appellants' additional common law claims against the towing companies.[14]

### A. Breach of Quasi–Bailment.

 The towing companies became bailees of appellants' vehicles when they took possession of them in expectation of compensation. See First Am. Bank, supra, 583 A.2d at 996. This is so even absent an explicit agreement: "[a]ll that is required is the existence of a mutual benefit." Id. This court has termed such a relationship a quasi-bailment. See id. Because of this relationship, the towing companies, as bailees, owed the appellants a duty to exercise ordinary care in the towing and impoundment of the appellants' vehicles. See id. at 997.

Relying on First American Bank, appellants argue that a towing company's duty to exercise ordinary care necessarily includes a duty to notify a vehicle owner of impoundment. But First American Bank did not involve a lack of notice. Rather, there, the appellant witnessed the towing and attempted to stop it. See id. at 995. And the issue in First American Bank was whether the defendants were liable for the disappearance of a money bag that had been inside the vehicle. Although First American Bank holds that companies must exercise ordinary care to safeguard vehicles in their possession, it is silent on the issue of notice.

Nor do appellants fare better by citing Wisconsin Ave. Sunoco v. Boone, a case from the District of Columbia Small Claims Court. See 126 D.W.L.R. 1729 (D.C.Super.Ct.Sm.Cl., Sept. 14, 1998) ["Boone"]. Similar to this case, in Boone, the vehicle owner's car was stolen, he reported the theft to the police, and MPD recovered the vehicle and requested impoundment. Neither MPD nor the towing company notified Boone of the recovery or impoundment for seven months, and the towing company billed Boone $3,254.64 for towing and storage. 126 D.W.L.R. at 1729, 1731. Yet, unlike this case, the District and the towing company had entered into an express contract, imposing certain duties on the towing company, such as, "[p]rior to providing any service[,] each tow truck operat[or] shall inform the owner or operator of the vehicle of all charges associated with the desired service(s)...." Id. at 1729. Based on this contract, the

---

13. This despite the court's earlier denial of the towing companies' motion to dismiss these claims. For example, the trial court denied the motion to dismiss the conversion claim, noting that the towing companies "fail[ed] to show that the initial possession of the vehicles was lawful." Yet the court failed to address this claim at the summary judgment stage.

14. As noted above, however, the record is void of any evidence that the towing companies and the District conspired to deprive vehicle owners of notice. See, supra, note 8. Accordingly, appellants' civil conspiracy claim fails against the towing companies as well.

court concluded that the towing company shared MPD's responsibility to notify. *Id.* at 1732.

Here, there is no express contract between the towing companies and the District and thus no expression of a shared responsibility.[15] Appellants dispute this distinction, arguing that the towing companies have an implied contractual relationship with the District. Because the companies and the District mutually benefit from their relationship—the companies gain business almost exclusively through the District, while the District benefits by not having to impound vehicles—appellants' argument is not without merit. But the critical distinction between this case and *Boone* is not that *Boone* involved an express contract, it is that the contract in *Boone* contained express provisions that required the towing company to apprise the vehicle owner of all charges before providing any service.

 Absent such an express provision here, appellants bore the burden of adducing evidence showing that the towing companies were obligated to provide notice of impoundment. Appellants attempted to present such testimony through the expert testimony of Brian Albrite, a Virginia towing company owner. In deposition, Mr. Albrite opined that towing operators have a duty to notify owners that their vehicles are being held. He could not, however, base his opinion on any D.C. statute or regulation. And he conceded that he was unfamiliar with D.C. laws and regulations regarding towing. For these reasons, the trial court rejected his expert testimony. "Whether a witness possesses the requisite qualifications to express an opinion on a particular subject is within the trial court's

discretion, and its decision in that regard will only be reversed for an abuse." *Jung v. George Washington Univ.*, 875 A.2d 95, 105 (D.C.2005) (internal quotation omitted). Given Mr. Albrite's conceded unfamiliarity with D.C. towing laws or regulations, we see no abuse of discretion in rejecting his testimony.

 Without Mr. Albrite's testimony, appellants could not prove the applicable standard of care or its breach. Accordingly, the trial court appropriately granted summary judgment on appellants' breach of bailment claims. Yet as noted above, the trial court failed to decide appellants' remaining common law theories. We must therefore remand this case so that the trial court can consider these arguments.

## VI. Conclusion

We affirm the trial court's denial of class certification as well as the dismissal of all claims against the District of Columbia. Regarding the towing companies, although we affirm the court's dismissal of appellants' breach of bailment claim, we must remand the case for the trial court to consider appellants' conversion, unjust enrichment, and CPPA claims.

*So ordered.*

---

**15.** On the contrary, Commander Joseph F. Griffith—the individual responsible for overseeing MPD towing services—confirmed that while MPD has a duty to notify the vehicle owners, neither the MPD Special Order nor any other regulation imposes a similar duty on towing companies.