WASHINGTON GAS LIGHT COMPANY, Appellant/Cross-Appellee,

v.

PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA, et al., Appellees/Cross-Appellants.

Nos. 12–CV–106, 12–CV–150.

District of Columbia Court of Appeals.

Argued June 29, 2012.
Decided Feb. 28, 2013.

---

Scott M. Abeles, with whom Paul H. Teague, Washington D.C., and L. Edward Funk were on the brief, for appellant.

Jimmy R. Rock, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before OBERLY, BECKWITH, and EASTERLY, Associate Judges.

BECKWITH, Associate Judge:

This appeal stems from a dispute between a public utility and its regulator over the utility's failure to turn over the entirety of an outsourcing contract the regulator wanted to review as part of its consideration of a request for a rate increase. From the perspective of the regulator, the Public Service Commission of the District of Columbia, the behavior of the utility, Washington Gas Light Company, in furnishing the body of the agreement but not all of its appendices constituted a knowing and willful flouting of its obligation to turn over whatever records the Commission demanded and thus warranted the steep sanction imposed in a Superior Court action enforcing that forfeiture. In the view of Washington Gas, the appellant and cross-appellee in this case, its actions stemmed from a benign misunderstanding or good faith response to the Commission's order borne of some confusion surrounding the Commission's issuance of another order in a separate but related discovery matter involving other parties to the rate proceedings.

We affirm the Superior Court's determination that Washington Gas knowingly and willfully violated the Commission's order to produce the contract and that it was therefore subject to daily $5,000 fines. We conclude, however, that those fines began accruing only once the time for seeking reconsideration of the Commission's order demanding production of the documents had expired. We likewise affirm the trial court's determination that appellees are liable for the conversion of the $350,000 Washington Gas paid the Commission under protest before this court ruled in a prior appeal that the Commission did not have authority to impose a forfeiture sanction without bringing a court action.

## I. Background

Appellant Washington Gas is a public utility that provides natural gas to customers in the Washington, D.C., area. The Public Service Commission, which along with the District of Columbia is an appellee in this case, is an independent government agency that regulates utility

companies operating in D.C. As part of its oversight role, the Commission has broad authority to regulate "all aspects of public utility rates and services," *Washington Gas Light Co. v. Pub. Serv. Comm'n,* 856 A.2d 1098, 1105 (D.C.2004), and, more specifically, broad authority to demand the production of relevant documents during rate proceedings, D.C.Code § 34–907 (2001). In December of 2006, that authority came into play when Washington Gas filed a request to increase its rates.

In 2007, within a year after it had instituted proceedings seeking to increase the rates it charges its District of Columbia customers, Washington Gas entered into a ten-year $350 million contract with Accenture LLP to outsource various customer service functions. The contract—sometimes referred to by the parties as the Master Services Agreement or MSA—totaled more than 600 pages, including the 75–page body of the agreement and its various appendices and exhibits.

The Commission wanted to see this contract. On July 16, 2007, it issued Data Request No. 4, which sought "a copy of the executed agreement" between Washington Gas and Accenture. Around the same time, the D.C. Office of People's Counsel (OPC), which represents utility ratepayers, and the Office and Professional Employees International Union Local 2 (OPEIU), which represents some Washington Gas employees, also requested copies of the contract. On July 18 and 19, 2007, Washington Gas responded to Data Request No. 4 by stating, among other things, that "due to public disclosure requirements the Company is unable to allow copies of the document," but noting that the staff of the Commission could "view the information at Washington Gas's ... offices, or the Company is willing to bring the documents to the Commission for viewing."

On Thursday, July 19, 2007, with the ratemaking hearing approaching on the following Monday, OPC filed a motion to compel immediate production of the entire contract. The next day, on Friday, July 20, 2007, the Commission issued Order 14383. That order acknowledged Washington Gas's statement that it was unable to file copies of the outsourcing contract but that it was "willing to make arrangements" for the Commission to view the material. In a short discussion section, however, the order stated that the Commission was authorized under D.C.Code § 34–905 (2001) "to order the production of any records or documents of any public utility at any time," noted its concern with Washington Gas's "failure to provide information to the Commission and the parties as requested in the discovery phase of this proceeding," warned Washington Gas that "any subsequent failure" to comply with the Commission's directives may result in a show cause order or fine, and ordered Washington Gas to file its response to Data Request No. 4 by 9 a.m. on the hearing date. On that same day, the Commission also entered Order 14384, which partially granted OPC's motion to compel while giving Washington Gas the option of providing the records to OPC or delivering them to the Commission Secretary's Office "for *in camera* inspection, by 12:00 noon on Saturday, July 21, 2007."

The next day, which was Saturday, July 21, 2007, Washington Gas submitted to the Commission a copy of the 75–page document that it described as "the Confidential Master Services Agreement between Accenture and Washington Gas that contains the critical features of the relationship between the parties." It also submitted two exhibits, stated that there were "other exhibits and attachments to the [contract] that are not related to the significant issues in this case," then noted that if the Commission nonetheless "wishes to review

*in camera* exhibits and appendices referred to in the [contract], Washington Gas will make those documents available to the Commission." [1] Washington Gas further asserted that it was neither "appropriate" nor "necessary to the vigorous airing of the issues in the rate case" for Washington Gas to "provide the parties with actual copies of the documents."

Two days later, on the day of the ratemaking hearing and shortly before the hearing began, the Commission entered Order 14385. Rejecting Washington Gas's reasons for withholding the contract, the Commission ordered Washington Gas to produce, to the Commission itself and to OPC and OPEIU, "[t]he whole MSA agreement, including all of its Appendices[.]" Washington Gas was ordered to submit these documents "to OPC, OPEIU, and the Commission Secretary's Office" by 5 p.m. that day, and the hearing was stayed upon Washington Gas's indication of its intent to move for reconsideration of Order 14385. Before the hearing was adjourned, Washington Gas challenged OPC's contention that the contract affected the rate change it was seeking, and OPC responded by requesting sanctions against Washington Gas. The Commission's chair stated that "the Commission also asked for a copy of the contract. It's just not OPC. It's OPC, it is the Commission, and it is the order."

On July 24, 2007, Washington Gas filed its motion for reconsideration of Order No. 14385, arguing that the requested documents were not relevant to Washington Gas's application to increase rates and that the material sought was proprietary and protected by a confidentiality agreement between Washington Gas and Accenture. The Commission took this motion and OPC's motion for sanctions under advisement, and on September 28, 2007, issued two separate orders: the first one denying reconsideration and denying OPC's request to sanction Washington Gas for its failure to comply with the Commission's discovery orders, and the second one imposing a $350,000 forfeiture against Washington Gas for its failure to comply with the Commission's orders to submit the complete Accenture outsourcing agreement to the Commission for in camera inspection. Emphasizing the Commission's "broad and unfettered authority" under D.C.Code § 34–907 "to require any public utility to produce any and all contracts" and Washington Gas's failure to produce the contract with all of its appendices, the Commission concluded that Washington Gas had committed "egregious violations" of the statutes granting the commission that authority [2] and had clearly violated the Commission's Orders 14383 and 14384. [3] The Commission stated that although Washington Gas had also violated

---

1. Washington Gas also argued that fair disclosure regulations of the Securities and Exchange Commission precluded the company "from making selective disclosures of material, non-public information."

2. In addition to D.C.Code § 34–907, the Commission also mentioned D.C.Code § 34–904 (2011), which spells out the Commission's right to inspect the "books, accounts, papers, records, and memoranda of any public utility," and D.C.Code § 34–905, which involves the Commission's authority to require the production of such records and the attendance of witnesses who can explain them.

3. The Commission "emphatically" noted that Washington Gas "was, and is, required to submit the MSA as ordered," and further noted that "the seriousness of [Washington Gas's] affront to the Commission" was exacerbated by its willingness to submit the full agreement to the Maryland Public Service Commission in a Maryland rate proceeding "while simultaneously arguing that disclosure of the same document in the District is 'unnecessary.'"

Order 14384, which ordered Washington Gas to produce "complete unredacted copies" of its contract with Accenture to OPC or deliver them to the Commission for in camera inspection, the Commission "want[ed] to make it absolutely clear" that its Order was based upon its own statutory authority to demand documents from public utilities, "which differs from any rights the parties have to receive documents under the discovery rules[.]" For these violations, the Commission sanctioned Washington Gas $350,000—$5,000 for each day the utility failed to turn over the whole contract. It imposed this sanction under D.C.Code § 34–706(a) (2001), which provides for a $5,000 fine for a failure to obey a Commission order, and under D.C.Code § 34–708 (2001), which establishes that every day that a public utility "knowingly or willfully" fails to comply with a Commission order constitutes "a separate and distinct violation of such order[.]" Later that day, Washington Gas produced the MSA, with all of its attachments and exhibits, to the Commission.

Washington Gas moved for reconsideration of the forfeiture order, arguing that it had "never refused to provide the complete MSA to the Commission," and stressing that it had immediately provided the contract to the Commission the day it received what it described as "the first Order where the Commission clearly required the Company to produce the entire MSA"—meaning Order 14587, the September 28, 2007, forfeiture order.[4] Upon the Commission's denial of that reconsideration motion, Washington Gas paid the forfeiture and appealed to this court. On October 8, 2009, this court held that the

Commission did not have the legal authority to impose a forfeiture under D.C.Code § 34–706(a) for alleged violations of its orders, and reversed the $350,000 forfeiture, indicating that the Commission was required to bring an action in Superior Court. *Washington Gas Light Co. v. Pub. Serv. Comm'n (Washington Gas I)*, 982 A.2d 691, 696, 722 (D.C.2009).

The Commission subsequently filed a complaint in Superior Court seeking a declaratory judgment imposing a $350,000 sanction against Washington Gas based upon its violation of Orders 14383 and 14384. Washington Gas filed a counterclaim alleging that the Commission was liable for conversion for failing to return the $350,000 payment to Washington Gas, plus interest, in light of this court's decision in *Washington Gas I*. On July 11, 2011, Superior Court Judge Anita Josey–Herring granted summary judgment to Washington Gas on the counterclaim, and the Commission subsequently paid Washington Gas $350,000 plus interest. In an oral ruling issued on September 30, 2011, the court granted summary judgment to the Commission on the forfeiture claim, concluding later in its written findings of fact that the Commission had been clear in requesting a complete copy of the Accenture contract, appendices and all, that "any production tendered by Washington Gas could not be considered complete without the inclusion of those attachments and addendums," and that Washington Gas had willfully violated Order 14383. Because Washington Gas's refusal to provide the Commission a complete copy of the contract was willful and knowing, the trial

---

4. Put differently, Washington Gas stated that it "was not put on notice that the Commission considered the Company in violation until the Commission's September 28, 2007[,] decision, over two months later." In fact, Washington Gas stated that it did not seek reconsideration of Orders 14383 and 14384 because it "thought then and still believes in good faith that it complied with those orders." It also stated that the company "was seeking to resolve a discovery dispute and was not challenging the Commission's authority."

court imposed a statutory forfeiture of $335,000 under D.C.Code §§ 34–706 and 34–708—$5,000 for each of the 67 days between July 23, 2007, the date by which Order 14383 directed the utility to file its response to Data Request 4, and September 28, 2007, that date it provided the contract in its entirety.[5] This appeal followed the trial court's December 30, 2011, denial of Washington Gas's motion to alter or amend the trial court's order.

## II. The Validity of the Forfeiture Sanction

We first address Washington Gas's contention that the trial court erred in determining that the company violated Order 14383 by failing to provide the Commission with the entire agreement between Washington Gas and Accenture.

This case comes to us from the trial court's granting of summary judgment, which we review de novo, using the same analysis that the trial court employed in considering the motion in the first instance. *Anthony v. Okie Dokie, Inc.,* 976 A.2d 901, 904 (D.C.2009). Summary judgment is proper where the record evidence demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Cain v. Reinoso,* 43 A.3d 302, 307 (D.C.2012).

At the outset, Washington Gas argues that the Commission's order was at best ambiguous and the trial court therefore erred in failing to construe it against the Commission. Order 14383 stated that Washington Gas "shall file its responses to Commission's Data Requests Nos. 3 and 4 by 9:00 [a.m.] Monday, July 23, 2007," and further reminded Washington Gas that "responses to all data requests are to be filed with the Office of the Commission Secretary." Data Request 4, in turn, stated:

> On June 20, 2007, WGL and Accenture issued a press release announcing the execution of a "multi-year agreement for Accenture to provide business process outsourcing, and service and technology enhancements to Washington Gas." Please provide a copy of the executed agreement.

In the view of Washington Gas, the directive to provide "a copy of the executed agreement" did not clearly require production of the Master Services Agreement and its appendices.

Based upon a plain reading of the disputed phrase, the MSA's own internal reference to what constitutes the contract, the fact that the Commission would have viewed the contract's exhibits and attachments as potentially integral to its duties to oversee the ratemaking process, and the Commission's broad power to request all documents it might need to do that job, we disagree with Washington Gas's characterization of the data request as ambiguous.

As an initial matter, it would be peculiar to construe an "executed agreement" as one that excludes the exhibits and attachments that are referred to throughout the contract and that flesh out the contract's terms. Accordingly, the very terms of the MSA itself, in a section called "Entire Agreement," state that "[t]his Agreement and any other agreements the forms of which are attached hereto and when executed by the Parties constitute the entire agreement between the Parties with respect to their subject matter[,]" and that "[t]he Appendices and all Work Agreements (and the Exhibits thereto) are incor-

---

**5.** The previous figure of $350,000 mistakenly calculated the first day of non-compliance as July 20, 2007, the date of the order.

porated herein by this reference." Given the importance accorded to the appendices by their explicit incorporation into the "entire agreement," it is illogical to conceive of "the executed agreement" as records excluding the appendices.

Further, that the Commission has wide-ranging authority to request documents it needs to carry out its regulatory and rate-making duties, which plainly encompasses the power to order the production of documents the importance of which is not entirely known until the Commission receives and reviews those records, warns against construing narrowly the Commission's formal requests for information. Indeed, Order 14383 specifically refers to the Commission's power to "order the production of any records or documents of any public utility at any time," and as the trial court stated, the Commission "required a complete copy of the MSA in order to properly evaluate Washington Gas's request for a rate increase, especially given the subject of the particular MSA at issue." These factors, as well as the order's general tenor evincing the Commission's impatience with the company's failure to file "complete responses," or any response at all, to the Commission's data requests, support the trial court's conclusion that "[i]t was clear from the data request that the complete copy of the MSA requested by the Commission included any and all attachments to the MSA, and any production tendered by Washington Gas could not be considered complete without the inclusion of those attachments and addendums."

Washington Gas still contends in its opening brief that the language the Commission used to describe the same documents in other orders—namely, Order 14384's reference to "complete and unredacted copies of WGL's 'Master Services Agreement'" and Order 14385's reference to "[t]he whole Agreement, including all of its Appendices, and specifically including at least fifteen (15) separately titled Appendices"—makes clear that the term "agreement" alone in Data Request 4 could not have " 'clearly' communicated to Washington Gas all of the descriptive information the Commission used when it demanded what it contends are the *very same* documents in Order No. 14383." On the contrary, the reference to "complete and unredacted copies" of the agreement and the characterization of the requested documents as the "[t]he whole Agreement" by no means suggest that an unadorned reference to the "agreement" denotes something less than the whole agreement. If anything, as it is hard to imagine the Commission was seeking an incomplete or partial agreement when it asked for "the agreement," these references tend to bolster the argument that "the agreement," whether it is called the "whole agreement" or the "complete agreement" or just "the agreement," meant "the agreement," appendices and all.

■ Washington Gas further argues that whether the order was ambiguous or not, the trial court incorrectly applied the sanction in D.C.Code § 34–706, which is (in relevant part) entitled: "Failure to perform duty or obey Commission order." Section 34–706(a) states that:

If any public utility shall violate any provision of this subtitle, or shall do any act herein prohibited, or shall fail or refuse to perform any duty enjoined upon it for which a penalty has not been provided, or shall fail, neglect, or refuse to obey any lawful requirement or order made by the Commission, or any judgment or decree made by any court upon its application, for every such violation, failure, or refusal such public utility shall forfeit and pay to the District of Columbia the sum of $5,000 for each such offense. In construing and enforc-

ing the provisions of this section, the act, omission, or failure of any officer, agent, or other person acting for or employed by any public utility acting within the scope of his employment and instructions shall in every case be deemed to be the act, omission, or failure of such public utility.

Relying on that statute, the trial court in this case concluded that Washington Gas's violation of Order 14383 subjected it to the $5,000 fine specified in § 34–706(a). As we have already concluded that the case involves a public utility's failure to obey a lawful order made by the Commission, the provision appears at first blush to apply to the circumstances of this case. Washington Gas says this assumption is wrong for several reasons.

Washington Gas primarily argues that D.C.Code § 34–905 is the only penalty provision that can apply to a violation of Order 14383, and under that statute, the maximum daily fine that could be levied against Washington Gas is $100. Section 34–905 provides that

> [t]he Commission may require, by order or subpoena ... the production within the District of Columbia at such time and place as it may designate of any books, accounts, papers, or records kept by such public utility in any office or place without the District of Columbia ... in order that an examination thereof may be made by the Commission under its direction.

The statute further states that "[a]ny public utility failing or refusing to comply with any order or subpoena shall for each day it

shall so fail or refuse forfeit and pay to the District of Columbia the sum of $100, to be recovered in an action to be brought in the name of said District." D.C.Code § 34–905. In the view of Washington Gas, the trial court was required to apply the penalty provisions of § 34–905, not § 34–706(a), to its purported violation of Order 14383 because it was the basis of the trial court's and the Commission's rulings,[6] because the language of § 34–905 is most applicable to the circumstances, because § 34–706 is a catchall provision that only applies to violations for which a penalty has not otherwise been provided, and because principles of statutory construction require application of § 34–905 as the more specific of the two penalty provisions. Washington Gas raises these arguments for the first time on appeal.[7]

▪ Even assuming that Washington Gas has not forfeited this claim, we are not persuaded that the Commission was restricted to seeking a $100 fine against Washington Gas for its violation of the Commission's order. As this court noted in the first appeal in this case, "[i]t is true that the penalties in Title 34 are cumulative and the imposition of one does not bar the imposition of another." *Washington Gas I*, 982 A.2d at 720 n. 128. For that proposition, the court cited D.C.Code § 34–711 (2001), which states that "all penalties and forfeitures accruing under said chapters [of Title 34] shall be cumulative, and a suit for any recovery of one shall not be a bar to the recovery of any other penalty." And as for Washington Gas's contention that § 34–706(a), by its own

---

6. Washington Gas points out that the Commission specifically relied upon § 34–905 in Order 14383 when it stated that "[p]ursuant to Section 34–905 of the D.C. Official Code, the Commission may order the production of any records or documents of any public utility at any time." The trial court, too, noted in its oral findings that the Commission's statutory

right to the documents stemmed from § 34–905.

7. Appellees argue that Washington Gas has forfeited these arguments. Because we find no merit to the claim, we decline to address the question whether it was forfeited.

terms, is applicable only to violations "for which a penalty has not been provided," we construe the statute differently. Although the statute does penalize the failure or refusal "to perform any duty enjoined upon it for which a penalty has not been provided," that language is wholly separate and distinct from—and does not apply to—the violation at issue in this case, which involved Washington Gas's "fail[ing], neglect[ing], or refus[ing] to obey any lawful requirement or order made by the Commission." D.C.Code § 34–706(a). Given that this language describes precisely the circumstances of this case—that is, Washington Gas was found to have "fail[ed] ... to obey" an "order made by the Commission"—and given that § 34–711 specifically contemplates cumulative penalties, the trial court's imposition of a $5,000 penalty under § 34–706(a) for Washington Gas's violation of Order 14383 does not produce an absurd result or run afoul of the tenets of statutory construction. *See Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754–55 (D.C.1983) (en banc).

■ Washington Gas next argues that the trial court erred in compounding the statutory forfeiture for each of the sixty-seven days between July 23 and September 28, 2007. The trial court did so under the authority of D.C.Code § 34–708, which provides that "[e]very day during which any public utility ... shall fail knowingly or willfully to observe and comply with any order or direction of the Commission ... shall constitute a separate and distinct violation of such order[.]" In other words, the trial court concluded that because Washington Gas's failure to provide the entire outsourcing contract was willful and knowing, and because it failed to turn over that contract every day between July 23, 2007, the date by which Order 14383 required compliance, and September 28, 2007, when the Commission issued its forfeiture order and Washington Gas immediately turned over the contract, the court could impose a $5,000–a–day penalty for this infraction.[8]

Washington Gas's argument that its conduct was not knowing or willful to a large extent recycles its contention that the company's failure to comply with what it calls an ambiguous order could not possibly be willful or knowing. Thus a persistent thread throughout the company's argument against willfulness is that the purported violation of Order 14383 was all but unwitting, and that the company tried to accommodate the Commission's request by providing what it understood to be "the

---

**8.** Washington Gas contends that the fine in this case violated the constitutional prohibition on excessive fines under the Eighth Amendment to the United States Constitution. As an initial matter, the company did not raise this claim in the Superior Court. In any event, while we agree the forfeiture the Commission imposed in this case has a partly punitive purpose, it does not meet the second requirement of a constitutionally excessive fine in that it is not grossly disproportional to the gravity of the offense. *See One 1995 Toyota Pick–Up Truck v. District of Columbia*, 718 A.2d 558, 560–61 (D.C.1998). The steep penalty at issue in this case—and the per diem multiplier for knowing and willful violations—are used to induce large utility companies with substantial financial assets to comply with the Commission's orders. We disagree with Washington Gas that the circumstances in *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), and *One 1995 Toyota Pick–Up Truck*, 718 A.2d 558, two cases in which individuals were ordered to forfeit large sums, are analogous. Washington Gas's Eighth Amendment argument also depends to some degree upon its ongoing portrayal of its infringement in this case as a mere "document production violation[ ]" that caused "very small" harm and that typically triggers a one-time $100 sanction—a characterization we have rejected in this opinion.

executed agreement"—namely, the 75-page MSA without most of its exhibits and attachments—and by welcoming the Commission to view in camera any additional appendices it wanted to see. We have already concluded, however, that the Commission's request for the entire agreement, delivered to the Commission, not just made available for viewing on request, was not ambiguous. As the trial court stated in its oral findings, "[t]o characterize this as a case of Washington Gas [and] Light Company being cooperative I think it's a stretch."

Washington Gas acknowledges in its brief that "the D.C.Code generally enables the Commission to inspect or require production of the business documents of a public utility[.]" It still insists that its failure to produce the Accenture contract was not knowing and willful because it repeatedly offered to provide it or permit the Commission to view it. Yet the fact remains that the company did *not* produce the documents requested in Data Request 4. It did not produce them when Order 14383 made clear that Washington Gas's initial response to Data Request 4—in which the company indicated that it was "unable to allow copies of the document" and instead invited Commission staff to view the records at Washington Gas's offices or at the Commission's offices—was noncompliant. And it did not produce them when the Commission's chair made

clear that the dispute among the litigants was not the only issue and that "the Commission also asked for a copy of the contract. It's not just OPC." [9]

Washington Gas's July 21, 2007, response to Order 14383 further confirms that its failure to produce the MSA to the Commission was knowing. The letter acknowledged that the two MSA exhibits it was turning over were not all of the exhibits, noting that "[t]here are other exhibits and attachments to the MSA that are not related to the significant issues in this case." It acknowledged that Washington Gas was "mindful of the important regulatory role and authority of the Commission." It invited the Commission to review the missing documents in camera. Under the circumstances, it is clear that Washington Gas made a calculated decision not to produce the records the Commission requested, all the while knowing that its failure to do so was a failure to comply with the Commission's order. [10]

Though § 34–708 requires that the violation be *either* knowing or willful, much of the same evidence that confirms the company's failure to comply with Order 14383 was knowing also supports a conclusion that it was willful. D.C. law states that "[e]very public utility *shall furnish* to the Commission all information required by it to carry into effect the provisions of [Title 34]," and even specifically states that

---

**9.** Nor did it produce them when the Commission issued Order 14385, which, in addressing issues pertaining to Washington Gas's disputes over discovery with OPC and OPEIU, referred to the "entire Master Services Agreement (MSA)" as "including all of its Appendices[.]"

**10.** Though not dispositive, it is worth noting that in her September 28, 2007, letter to the Commission accompanying Washington Gas's submission of the "over–500 pages of MSA attachments and exhibits," the company's general counsel stated, "With this submission,

the Commission will be in receipt of *the complete MSA.*" If the company viewed the attachments as integral to a "complete MSA," its failure to produce them in response to Order 14383 was presumably knowing. The general counsel testified in her February 14, 2011, deposition, however, that the letter's phrase was only "mirroring what the Commission had characterized as the complete [agreement]," and "was not the characterization that we gave to the MSA, because the MSA was the 75–page document."

"[w]henever required by the Commission, every public utility *shall deliver to the Commission* any and all ... contracts[.]" D.C.Code § 34–907 (emphasis added). Despite this clear legal duty, Washington Gas chose a different route. It first responded to Data Request 4 by declining to provide copies of the contract, citing confidentiality concerns. And then it responded to Order 14383 by furnishing only part of the contract, expressing its view that the remaining portions were "not related to the significant issues in this case," and offering to make those other exhibits and attachments available for in camera review if the Commission so desired. That Washington Gas may have gotten caught up in trying to keep certain parts of the Accenture contract from OPC and the union does not alter the fact that it flouted the Commission's order to produce the entire contract *to the Commission.* Washington Gas's counsel's acknowledgement at oral argument that "we put our foot down" with respect to the parties' request for the outsourcing agreement and all of its attachments raises more questions than answers about the company's failure to comply with the Commission's own request for the contract in Order 14383. We agree with the trial court's conclusion that "Washington Gas did not comply at its own peril." Application of § 34–708's per diem multiplier was warranted on the facts of this case.

■ Having determined that the trial court properly imposed a $5,000-a–day sanction against Washington Gas for a knowing or willful violation of Order 14383, we turn now to Washington Gas's challenge to the number of days it can fairly be held to be in violation of the order.

Washington Gas argues that because it had 30 days under the Commission's rules to seek reconsideration of Order 14383, forfeiture could not properly be ordered until that time period had lapsed, and the company accordingly should not be sanctioned for those first 30 days. Appellees argue that Washington Gas's claim has no merit because the company never actually moved to reconsider Order 14383, and had no basis for doing so given the Commission's statutory right to complete copies of the contracts of its regulated utilities.[11]

For several reasons, we agree with Washington Gas that the per diem sanctions against the company should be calculated from the date on which the time for reconsideration had expired. At the outset, although the Commission's rules of practice and procedure do not explicitly address whether an order's execution is stayed during the reconsideration period when no reconsideration motion is filed, the rules themselves provide several clues. It is clear from the rules, as an initial matter, that anyone affected by a final order has 30 days within which to seek reconsideration of that order, and that "[t]he filing of an application for reconsideration shall act as a stay upon the execution of the order or decision of the Commission until the final action of the Commission upon the application." 15 DCMR §§ 140.1 & 140.7. At oral argument, counsel for appellees acknowledged that if Washington Gas had actually filed a motion for reconsideration of that order at any point during the first 30 days, the imposition of sanctions would have been stayed from the date of the order. As interpreted by the Commission, 15 DCMR

11. Appellees also argue that Washington Gas never raised this argument in the trial court and therefore forfeited it. While ordinarily issues not raised in the trial court are waived on appeal, we think it appropriate to review the merits of this claim given the amount of the fine and the lack of surprise or prejudice to the Public Service Commission. *See Williams v. Gerstenfeld,* 514 A.2d 1172, 1177 (D.C.1986).

§ 140.7 thus arguably anticipates an "execution" date that comes after the issuance of the order. In other words, an application for reconsideration, filed at any point during the reconsideration period, imposes a stay upon an execution that has not yet occurred, for the duration of the reconsideration proceedings.

Whether 15 DCMR § 140 should be read that way or not, another section of the regulations—that involving the payment of forfeiture orders, *see* 15 DCMR § 160.8—contains language that sheds more light upon how the Commission's rules view the effect of reconsideration periods generally. In specifically providing that payment of a forfeiture "shall be due no more than forty-five days after the forfeiture order becomes final and is no longer subject to reconsideration and appeal," 15 DCMR § 160.8 signifies that under the rules, orders that are not challenged by reconsideration motion or appeal become final for the purpose of assessing forfeitures once it is clear they will not be timely challenged. *Cf. Clay v. United States*, 537 U.S. 522, 532, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (holding that for federal criminal defendants who do not file a petition for certiorari with the U.S. Supreme Court on direct appeal of their convictions, the federal habeas corpus statute's "one-year limitation period starts to run when the time for seeking such review expires"); *Hanover Ins. Co. v. United States*, 880 F.2d 1503, 1509 (1st Cir.1989) (holding that "a decision of the Tax Court is not final in the requisite sense until it can no longer be modified, that is, until the time to file for rehearing of a denial of certiorari has passed"). We see little or no difference between that context and the one at issue here, where the amount of the forfeiture depends on the extent of a party's failure to comply with a lawful commission order.

Second, the statute that provides for the fine in question states that a public utility shall forfeit $5,000 if it "shall fail, neglect, or refuse to obey any *lawful* requirement or order made by the Commission." D.C.Code § 34–706 (emphasis added). This focus upon a "lawful ... order" distinguishes cases like this one, involving a Public Service Commission sanction, from the context of civil or criminal contempt, for example, where violations of an order are punishable even if the order is later deemed invalid. *See, e.g., Bansda v. Wheeler*, 995 A.2d 189, 196 (D.C.2010) (stating, in a divorce action, that one party's contempt conviction for failing to vacate the home or pay rent to the other party must be upheld even if the court's order was invalid); *Baker v. United States*, 891 A.2d 208, 212 (D.C.2006) ("Compliance with court orders is required until they are reversed on appeal or are later modified."). That a party can be subject to forfeiture only for violating a lawful order adds force to the contention that the per diem sanctions should commence after the time for reconsideration has run.

Finally, as Washington Gas points out, the Commission stated in its briefing before this court in *Washington Gas I* that it would have been "premature for the Commission to order forfeiture" any sooner than "the expiration of the 30–day time limit for [Washington Gas] to seek reconsideration/stay" of Order 14383. Appellees resist Washington Gas's claim that they therefore implicitly conceded that the 30 days should be excluded from the calculation of sanctions. Concession or not, however, the notion that the forfeiture would not formally take effect until the time for reconsideration has expired is consistent with, if not compelled by, the most relevant provisions in the statute and regulations. Notably, whatever benefit this interpretation of the rules bestows upon the sanctioned party is a modest one

as the party could have achieved the same end at any point within the 30 days simply by applying for reconsideration and obtaining a stay upon the order's execution.[12] In a usual case, it would be difficult to assess whether a party not seeking reconsideration neglected its rights, wrongfully believed it had complied with the order, or forwent challenging the order for some other reason. Therefore, considering the Commission's own view that it cannot issue a forfeiture order until after the expiration of the reconsideration period, we think the better rule exempts the 30–day reconsideration window from forfeiture.

Based on these considerations, we conclude that the per diem fines for Washington Gas's violation of Order 14383 should be calculated from the day the 30–day period for reconsideration expired, rather than from the company's initial violation on July 23, 2007.[13]

## III. Washington Gas's Conversion Claim

■ In a counterclaim, Washington Gas contended that the Commission's failure to return to it the $350,000 forfeiture payment that this court stated in *Washington Gas I* could "not stand" constituted conversion, which we have defined as "an unlawful exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property." *Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C.2011) (citation and internal quotation marks omitted). The trial court agreed, granting summary judgment to Washington Gas on

---

**12.** This reading is also one of modest effect in that it is presumably the unusual case in which the Commission imposes sanctions without first issuing a show cause order that would forecast the likelihood and severity of sanctions and be more likely to prompt the party to seek reconsideration of the order in question. *See* 15 DCMR § 160.3. In this case, Order 14383 warned Washington Gas that "any subsequent failure by [Washington Gas] to comply with the lawful directives of the Commission may result in a show cause order and or fine." When Washington Gas failed to produce the full Accenture contract, the Commission did not issue a show cause order but directly issued the forfeiture order, Order 14587. Washington Gas concedes that any due process concerns stemming from the Commission's failure to provide notice and opportunity to be heard on the alleged violation of Order 14383 were likely rendered moot by this court's holding in *Washington Gas I* that the Commission was not authorized to adjudicate violations of its own orders but was required to file an action in Superior Court.

We find unconvincing Washington Gas's remaining due process claim that Order 14383 was issued without the statutory due process required under D.C.'s Administrative Procedure Act, which states that every party in contested cases shall have the right to present evidence and argument to challenge any order. D.C.Code § 1–109(a) & (b). At the outset, Washington Gas's argument assumes, again, that the Commission's request for the outsourcing agreement was ambiguous, a contention we have already rejected. Moreover, the facts that Washington Gas did not seek reconsideration of Order 14383, which would have afforded it further process before the Commission, and that it was permitted to fully present its challenges to the Commission's complaint in Superior Court convince us that the company was not deprived of due process under the APA.

**13.** We reject, however, Washington Gas's argument that it should not have to pay daily fines for the extra days the Commission granted itself to decide the motion to reconsider Order 14385. On August 17, 2007, the Commission issued an order tolling for 30 days—until September 26, 2007—the deadline for its ruling on Washington Gas's motion for reconsideration. On September 26, 2007, the Commission issued another order extending the deadline for five additional days, though it issued its ruling only two days into that five-day period. The Commission's reconsideration of Order 14385 was independent of Order 14383, and it was within Washington Gas's power to stop the accumulation of penalties during that period by producing the executed contract.

the counterclaim and granting prejudgment interest on the converted sum starting on February 29, 2008, the date Washington Gas submitted to the Commission a check for $350,000, along with a letter noting that the payment was "made under protest." On appeal, the Commission and the District of Columbia ask us to reverse the trial court's judgment on the counterclaim because Washington Gas failed to give proper notice of its claim under D.C.Code § 12–309 (2001). Washington Gas counters that § 12–309 does not apply to its conversion claim because the statute requires notice only in actions seeking unliquidated damages, while the damages at issue here, the company contends, "could hardly have been more 'certain.' "

■ Section 12–309 of the D.C.Code—a statute we have repeatedly held is to be construed strictly against the claimant[14]—states that one cannot pursue an action seeking unliquidated damages against the District of Columbia without first giving notice of the claim "within six months after the injury or damage was sustained." D.C.Code § 12–309. The applicability of § 12–309 thus depends upon whether the damages at issue in this conversion claim are unliquidated. "A debt is liquidated if at the time it arose, it was an easily ascertainable sum certain." *District of Columbia v. Campbell,* 580 A.2d 1295, 1300 (D.C. 1990) (internal quotation marks omitted).

The Commission and the District nevertheless take the position that whether or not the damages at issue in Washington Gas's counterclaim constituted an ascertainable sum certain, this court's decision in *Snowder v. District of Columbia,* 949 A.2d 590 (D.C.2008), recognized a bright-line rule that conversion claims against the District of Columbia are subject to the notice provisions of § 12–309. In *Snowder,* a case in which the plaintiffs sought damages for automobile towing and storage fees allegedly imposed without adequate notice or consent, this court stated that "[t]ort claims"—such as the plaintiff's conversion claim in that case—"are considered unliquidated." *Id.* at 600–01. In the Commission's view, *Snowder's* language follows from (and *Snowder* specifically cites) *District of Columbia v. World Fire & Marine Ins. Co.,* 68 A.2d 222 (D.C.1949), which concluded that a tort claim regarding the District's mishandling of a settlement check was unliquidated and the fact that the claim in that case was for a specific amount "did not convert it into a liquidated claim."[15] *Id.* at 225.

Although we do not take issue with the Commission's assertion that a conversion claim is a tort claim and that tort claims are generally unliquidated, we also do not read *Snowder* to hold that all conversion claims against the District are categorically subject to D.C.Code § 12–309 because they are by definition suits for unliquidated damages. Such a rule would run counter to longstanding precedent in which the nature of the damages at issue was determined by analyzing whether it was an

14. *See Owens v. District of Columbia,* 993 A.2d 1085, 1089 (D.C.2010) (noting that "the requirement that the notice be given, and within the time specified, and to the proper officers, is strictly construed") (citation and internal quotation marks omitted).

15. *World Fire* was a decision of our predecessor court, the Municipal Court of Appeals for the District of Columbia. The decision is "binding on a division of this court unless overruled en banc or unless it is inconsistent with (hence was effectively overruled by) a subsequent decision by the United States Court of Appeals for the District of Columbia Circuit issued before February 1, 1971." *Thoma v. Kettler Bros. Inc.,* 632 A.2d 725, 727 n. 5 (D.C.1993) (citing *M.A.P. v. Ryan,* 285 A.2d 310, 311–312 (D.C.1971)). *See also Plummer v. United States,* 43 A.3d 260, 269 n. 24 (D.C.2012).

easily ascertainable sum certain. *See, e.g., District Cablevision Ltd. P'ship v. Bassin,* 828 A.2d 714, 731–32 (D.C.2003); *District of Columbia v. Pierce Assocs., Inc.,* 527 A.2d 306, 311 (D.C.1987). *Snowder* itself did not apply a categorical rule, but went on to determine, based upon the particular facts of that case, that the damages claimed there were unliquidated: "While some appellants paid certain amounts (which might not be the full extent of their damages, as they sought compensatory damages), others lost their cars entirely, and the value of the cars is uncertain." *Snowder,* 949 A.2d at 601.

The same was true in *World Fire,* the case cited in *Snowder* and upon which the Commission and the District greatly rely. In *World Fire,* the court noted that a tort claim "like the one [in that case]" was liquidated, that liquidated claims "generally" arose "ex contractu rather than ex delicto." 68 A.2d at 225. The court noted that even though the claim at issue in that case was for a specific amount, it was still unliquidated. *Id.* It reached that result, however, not because of a categorical rule that defines all tort claims as unliquidated, but based upon its analysis that the claim actually was *not* easily ascertainable. The court noted, that is, that "[n]o initial liability was either admitted or provided," that the D.C. commissioners were under no obligation to approve the claim for damages, that "their right to compromise claims is discretionary," and that the commissioners could have refused to pay the claim at all or "offered only partial settlement." *Id.* Neither *World Fire* nor *Snowder* requires us to find a claim to be unliquidated for purposes of § 12–309 simply on the grounds that conversion is a tort theo-

ry and that tort claims are unliquidated. *See, e.g., Jaiyeola v. District of Columbia,* 40 A.3d 356, 371 (D.C.2012) (holding that a claim for back pay under the Rehabilitation Act was a liquidated debt not subject to the requirements of § 12–309).

In this case—perhaps unique among tort cases—we agree with the trial court that the damages were easily ascertainable. On September 28, 2007, the Public Service Commission issued an order sanctioning Washington Gas $350,000. Washington Gas paid that amount under protest on February 29, 2008, and on October 9, 2009, this court held in *Washington Gas I* that the Commission had no authority to impose that forfeiture. Washington Gas's narrow conversion claim has always been about what it alleged to be the Commission's unauthorized exercise of control over the amount of that check. Unlike the damages associated with the conversion claims at issue in *Snowder* and *World Fire,* the damages claim here is a sum certain that, as Washington Gas puts it in its brief, "no party in this litigation has *ever* had any sort of difficulty calculating."

The Commission and the District contend that their reading is consistent with Congress's purpose in enacting § 12–309.[16] They point out that in potential tort claims, "the District generally has no pre-existing relationship with a tort victim," while in a contract claim, the District "generally can monitor its own performance and maintain its own records before a contract partner sues for breach." The circumstances of this case raise no such concerns, however, as the Commission has a close and ongoing relationship with Washington Gas and as the Commission

---

**16.** The purposes of the statute are: (1) to allow the District to investigate potential claims so that it can gather evidence while it is still available; (2) to enable the District to correct defective conditions; and (3) to facili-

tate the settlement of meritorious claims and the challenge of frivolous ones. *Tucci v. District of Columbia,* 956 A.2d 684 (D.C.2008) (citing *Hardy v. District of Columbia,* 616 A.2d 338, 340 (D.C.1992)).

was aware long before this court held that the Commission's $350,000 forfeiture order "[could]not stand" that Washington Gas contested the legality of the forfeiture. *See Washington Gas I,* 982 A.2d at 722.

As the Commission and the District are defending against the conversion claim solely on notice grounds under § 12–309, and do not contest the elements of conversion, we affirm the judgment of the Superior Court granting summary judgment to Washington Gas on its counterclaim.

■ As to the Commission's and the District's claim that the trial court overvalued the prejudgment interest due to Washington Gas on the conversion claim by calculating it from February 29, 2008, the date on which Washington Gas paid the forfeiture, rather than July 22, 2010, the date on which the company formally demanded its return, we agree with the trial court that the conversion should be measured from the time Washington Gas submitted a check for $350,000 under protest. A demand for the return of property "is necessary only when there are no other facts and circumstances independently establishing a conversion." *Bowler v. Joyner,* 562 A.2d 1210, 1212 (D.C.1989) (citation and internal quotation marks omitted); *see also id.* at 1213 (noting circumstances—such as the expiration of a lease on an apartment where the appellant's personal property was allegedly converted—that "would have created an implied demand for the return of the property"). Here, the company's clear statement that it was paying the forfeiture under protest was sufficient to establish that the conversion occurred when the Commission accepted the proceeds from the forfeiture order that this court later held it was not authorized to impose.

## IV. Conclusion

For the reasons stated in this opinion, we affirm the Superior Court's grant of summary judgment in favor of the Commission and the District of Columbia with respect to their claim for statutory forfeiture against Washington Gas, except that we remand for the trial court to recalculate the amount of the forfeiture in light of our conclusion that the daily fines properly began accruing once the time for seeking reconsideration had expired. We also affirm the Superior Court's grant of summary judgment on Washington Gas's counterclaim for conversion.

*So ordered.*